Charles CAMPBELL, Plaintiff,

v.

MEREDITH CORPORATION,
Defendant.

No. 00–2275–JAR.

United States District Court,
D. Kansas.

May 2, 2003.

Charles Campbell, Scottsdale, AZ, Pro se.

Lowell W. Finson, Peter J. Chung, Stephen A. Jenkins, Overland Park, KS, for Plaintiff.

Robert W. McKinley, Lathrop & Gage L.C., Kansas City, MO, for Defendant.

### MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT

ROBINSON, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 128). Charles Campbell ("Plaintiff") relies on the following theories of recovery: age discrimination in violation of the ADEA; hostile work environment based on gender in violation of Title VII; disability discrimination in violation of the ADA; and retaliation in violation of the ADEA, Title VII, and the ADA.

### UNCONTROVERTED FACTS

For purposes of this motion, the following relevant facts are uncontroverted. Plaintiff was hired by Meredith Corporation ("Defendant") in November 1971. Since 1992, Plaintiff has worked as a news editor for Defendant at KCTV. At all relevant times, the other two news editors were Ruth Naranjo and Charlene Pryor.

On May 16, 1995, Plaintiff received a letter from KCTV's General Manager, advising him that "[y]our demeanor is too often perceived by others as threatening. You must become more aware of what you say, how you say it, your body language,

and others' reactions to you." This correspondence closes by saying "[y]ou must correct others' perceptions and impressions of your demeanor, or you will be subject to further discipline—up to and including discharge." In January 1999, Plaintiff informed KCTV management that Ruth Naranjo, had "a particular dislike for" Plaintiff, and that Ms. Naranjo had previously made a false accusation that Plaintiff had "swore at her." In a letter to Plaintiff dated February 16, 1999, KCTV's News Director advised Plaintiff that some employees were uncomfortable or even afraid to work with him.

On March 12, 1999, Plaintiff approached Ms. Naranjo as she was preparing to leave for the day and said "who are you going to fuck over this weekend." Plaintiff only had a professional relationship with Ms. Naranjo and concedes that his comments to her were rude. Ms. Naranjo did not believe Plaintiff was joking, and she felt antagonized, intimidated, stressed, violated, and concerned for the people around her. Ms. Naranjo did not reply to Plaintiff and did not have any further interaction with him that day. Ms. Naranjo did not leave the building after the incident because she feared for her safety. In fact, Ms. Naranjo told Mr. Poduska, KCTV's Business Manager, that she felt physically intimidated by Plaintiff's actions.

When Plaintiff returned to work he was instructed to report to Mr. Poduska's office. At that time, Plaintiff met with Mr. Poduska and with Ms. Watson, the Assistant News Manager, and was informed they were investigating a complaint filed by Ms. Naranjo concerning certain comments Plaintiff allegedly made to Ms. Naranjo. Plaintiff denied making the alleged comments to Ms. Naranjo and indicated he did not know why she would make the allegation. Plaintiff now concedes that "I believe the management is probably right and I used the 'F' word, but I thought at the time I had used the word 'screw.' I mean that was my recollection."

After being interviewed by Mr. Poduska and Ms. Watson, Plaintiff "walked by the newsroom, went up the stairs. And [ ] was completely shaken, because [he] realized that Channel 5 probably had been trying to get rid of [him] and this was the excuse that they needed to fire [him]. [He] was completely shaken, which is the reason why [he] requested Family Medical Leave."

After the meeting with Mr. Poduska, Plaintiff contacted Charlene Pryor, another news editor who had overheard Plaintiff's comments, and said "if you don't tell them I was kidding, I'm going to be terminated." Pryor testified that:

He said, they are going to fire me, going to fire me, and I go, why, and he said, they said that I said, who are you going to fuck over this weekend. I didn't say that. I said Charlie, I heard you say it twice, and he said, well, I meant it as a joke, and I said, if you meant it as a joke, then tell them you meant it as a joke. He says, well, you can tell them I didn't say it. You have to tell them I didn't say that, and I said, I'm not going to lie. I heard what you said.

Plaintiff also contacted Ms. Naranjo and said "Ruth, they are going to terminate me, you know I was kidding, or something like that."

Mr. Poduska called and told Plaintiff not to discuss the matter with any other employees to avoid skewing the investigation. Plaintiff told Mr. Poduska that he would talk to anyone he wanted to. Plaintiff testified "I don't remember the sequence, but Poduska called and said don't talk to any employees. I said well, with all due respect, you know, I'll talk to my co-workers. I have already talked to them." Plaintiff believes that "the reason why [Mr. Poduska] didn't want me to talk to anybody was that they didn't have their story straight

yet. They wanted to do their investigation before I could ask any questions."

Plaintiff testified that on the way to his car after Poduska's phone call directing Plaintiff to not discuss the incident, he saw a couple of photographers on break and talked to them about the situation, and told them "I did something probably that I would be terminated for." Plaintiff also confronted Ms. Naranjo and Ms. Watson intervened and reminded Plaintiff that he was not supposed to discuss the issue with Ms. Naranjo. Ms. Watson then asked Plaintiff to leave the building.

Defendant terminated Plaintiff on or about March 16, 1999. Defendant informed Plaintiff that he was discharged for using the "F" word in a threatening manner to another employee and for disobeying the manager's order to not speak with the employees or interfere with their investigation. Plaintiff is not aware of any other employee that has committed the same violations and been disciplined less severely.

No previous employee had been terminated for the use of profane or obscene language. Use of profane language was normal in the newsroom. Many people in the newsroom joked with each other using profane language. Ms. Naranjo had previously called Plaintiff a "prick" when he pronounced her prior last name, "Horine," as "Hor (pause) ine." Plaintiff is only aware of four employees who had used the "F" word in the work place. Two of these four employees were Plaintiff's peers, news editors Naranjo and Pryor. The other two employees were Don North, the News Director, and Wendall Anschutz, the television news anchor.

While Plaintiff has no specific recollection of the incidents when Ms. Naranjo, Mr. North, or Ms. Pryor used the "F" word; he recalled Anschutz using the "F" word in conversations with Plaintiff in 1996 and 1999. One of the conversations involved Anschutz stating "don't ever fucking talk to me again." Plaintiff did not report the 1996 incident to any of Defendant's managers; and Plaintiff is not aware of any employee, manager or supervisor of Defendant that heard Mr. Anschutz use the "F" word. Plaintiff allegedly complained to Mr. North about the 1999 incident of Mr. Anschutz using the "F" word. Plaintiff does not know if Mr. North discussed the incident with Mr. Anschutz, but Plaintiff is not aware of any other instances where Mr. Anschutz has used the "F" word.

Prior to Plaintiff's termination, no newsroom employee had been terminated for "threatening or intimidating behavior" or "insubordination." Plaintiff had previously been the victim of an "abusive" or "very excitable" yelling incident by an on-duty supervisor, who was not terminated for such conduct. In a January 1999 letter to Don North, Plaintiff also complained of being shouted at and physically threatened in the newsroom by a producer. And, after Defendant terminated Plaintiff, a KCTV chyron operator was subjected to intimidating and domineering behavior from a KCTV engineer on the news set, culminating in an incident where the engineer pulled a headset off the camera operator's head. KCTV management was aware of the incident and investigated, but merely issued a warning to the engineer rather than a termination.

At the time of his termination, Plaintiff was the oldest of three full-time video editors at KCTV. At the time of his termination, Plaintiff was 70 years old, Ms. Naranjo was 49 years old, and Ms. Pryor was 51 years old. After Defendant terminated Plaintiff, Ms. Pryor and Ms. Naranjo continued to work for Defendant as full-time editors. Defendant did not hire a third full time editor, but relied on these two full-time editors, as well as assistance from part-time editors and photographers.

Plaintiff alleges that Defendant discharged him because of his age, since he "believe[s] that probably other KCTV employees and Meredith employees who did similar things were not disciplined to the extent [he] was.... And these would be younger—younger employees." In fact, Plaintiff alleges that before he was terminated he complained to management about age discrimination. Plaintiff stated that in January 1999 he complained about an incident that had occurred five years earlier, in 1994, "in which I was denied leave to attend a wake of my best friend." Plaintiff also alleges he made "a general complaint about working nights for many years, including ending with the rotating schedule which I also thought was discriminatory, age discriminatory." But, Plaintiff concedes that the rotating schedule began in 1996 and in fact provided more opportunities for him to work a better shift. And, although alleging that his seniority over Ms. Naranjo and Ms. Pryor was not taken into account, Plaintiff admits that all three were treated the same under the rotating schedule.

Plaintiff further admits Defendant did not have a practice or policy in which seniority affected job assignments or scheduling of work shifts for video editors. Plaintiff testified "everyone there, as a videotape editor, has approximately the same amount of experience, or they wouldn't be there. They're qualified to do the work. Having more experience is not an advantage. As you get older maybe there's more stress." Plaintiff does not believe his age made him less able to deal with the stress of being a video editor, testifying that the "quality of my work was satisfactory."

Plaintiff never filed a complaint with the EEOC regarding work assignments, the switch to the rotating schedule in 1996, or the denial of his request to attend his best friend's wake in 1994.

Plaintiff testified that he has a disability, stress or depression; but, he concedes that he did not make a claim for failure to accommodate any such disability. Plaintiff alleges that stress affects his ability to sleep and his family relationships because he's irritable. Plaintiff further alleges that his disability slightly affects his memory, but he characterizes that as more of an inconvenience than anything else. Plaintiff's irritability is not a significant issue, and he is able to function when he takes medication prescribed by his doctor. Plaintiff is able to shave, drive a car, cook, walk, exercise, read books, watch television, listen to music, converse with family, interact with friends and get along with others. According to Plaintiff, in 1999 he was able to do "all the normal function[s] of life that would keep you out of a nursing home," including taking care of himself, performing daily functions, playing golf and enjoying himself. Plaintiff testified that the stress he suffered diminished his enjoyment and participation in social activities with his wife and friends. He testified that he now dines out once every six weeks as opposed to once a week; and he now has sex once a month instead of three times a week.

Plaintiff requested disability leave from Defendant from December 10, 1998 through January 8, 1999. Defendant granted Plaintiff's leave request. On January 11, 1999, Plaintiff's physician completed a form releasing him to return to work, and indicating that Plaintiff had no restrictions on his ability to perform his job.

Plaintiff concedes that he did not include a claim for hostile work environment due to gender in his EEOC charge. Plaintiff's hostile work environment claim is based on offensive graffiti that was displayed on the newsroom walls. There were pictures and/or writings containing profanity and/or references to sexual body parts. Plaintiff

cannot explain how this graffiti was offensive to him as a man, and even states that he wasn't more sensitive to it than a woman would be, "because most of them were offensive to women and directed against women."

## CONCLUSIONS OF LAW

### Summary·Judgment:

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [1] In applying this standard, the Court must "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." [2] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." [3] A factual dispute is "material" only if "under the substantive law it is essential to the proper disposition of the claim." [4] If the party bearing the burden of persuasion at trial fails to come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial.[5]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." [6] A movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim, and may make its prima facie demonstration by simply pointing out the lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]

If the movant meets this initial burden, "the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." [8] In order to do this, "the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." [9]

 Defendant has stated the facts of this case in accordance with D. Kan. Rule 56.1. Plaintiff's response, however, does not comply with the local rules.[10] In his

1. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir. 1993).

2. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citations omitted).

3. *Id.* (citation omitted).

4. *Id.* (citation omitted).

5. *Id.* (citation omitted).

6. *Id.* at 670–71 (citation omitted).

7. *Id.* at 671 (citation omitted).

8. *Id.* (citations omitted); *see also* Fed.R.Civ.P. 56(e).

9. *Id.* (citation omitted).

10. Plaintiff has not complied with Rule 56.1. D. Kan. Rule 56.1 provides in relevant part:

 A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relied, and, if applicable, shall state the number of movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purposes of summary judgment unless specifically controverted by the statement of the opposing party.

opposition to Defendant's motion, Plaintiff submits his own facts and does not controvert Defendant's statement of facts. Thus, Defendant's proffered material facts are deemed uncontroverted. But, the Court will not automatically grant Defendant's motion for summary judgment because of Plaintiff's failure to comport with the local rules. Rather, the Court will base its determination on Defendant's statement of uncontroverted facts, along with the uncontroverted facts submitted by Plaintiff.

## ADA

■ The Americans with Disabilities Act ("ADA") prohibits discrimination against a qualified person because of that person's disability, in regard to job application procedures, hiring, advancement, or discharge, compensation, job training, and other terms, conditions, and privileges of employment.[11] When considering a claim brought under the ADA, the Court is guided by the *McDonnell Douglas* analytical framework.[12] The first step requires a plaintiff to establish a prima facie case by proving that: (1) he or she is a disabled person within the meaning of the ADA; (2) he or she is a "qualified individual," that is, he or she is able to perform the essential functions of the job, with or without accommodation; and (3) he or she suffered adverse employment action because of the disability.[13] Plaintiff's ADA claim could be considered abandoned because he has not responded to Defendant's motion for summary judgment on this claim.[14] However, Plaintiff's ADA claim fails, even if not abandoned, because Plaintiff is not "disabled" within the meaning of the ADA.

■ A person is considered to have an ADA disability if he or she (a) has a physical or mental impairment that substantially limits one or more of his or her major life activities; (b) has a record of such an impairment; or (c) is regarded by the employer as having such an impairment.[15] Plaintiff's claim is based on only the first definition of disability, a physical impairment that limits a major life activity.[16] A three-step process is used to determine whether an individual is disabled under this first definition.[17] First, the court

The Court is cognizant that Plaintiff proceeds pro se and it has abided by the general rule that the pleadings of a pro se litigant are construed liberally. *See, e.g., Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991). Although it has searched Plaintiff's opposition to summary judgment and the attachments thereto in an effort to find arguments and evidence that would prevent summary judgment, the court is not Plaintiff's advocate and it should not construct arguments or theories for him. *Id.* at 1110; *Drake v. City of Fort Collins,* 927 F.2d 1156, 1159 (10th Cir.1991). Plaintiff is held to the same rules of procedure governing other litigants. *Green v. Dorrell,* 969 F.2d 915, 917 (10th Cir.1992), *cert. denied* 507 U.S. 940, 113 S.Ct. 1336, 122 L.Ed.2d 720 (1993). He cannot withstand summary judgment simply by relying on allegations in his opposition that are unsupported by the evidence in the record. *See Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992).

**11.** 42 U.S.C. § 12112(a).

**12.** *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Williams v. Widnall,* 79 F.3d 1003, 1005 & n. 3 (10th Cir.1996) (explaining application of the analysis in cases under the ADA).

**13.** *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997).

**14.** *See Eckholt v. American Business Information, Inc.,* 873 F.Supp. 526, 534 (D.Kan.1994) (holding that where parties did not respond to an issue in summary judgment motion, parties relinquished any claim on the issue and conceded that summary judgment should be entered against them).

**15.** 42 U.S.C. § 12102(2).

**16.** *See* Pretrial Order (Doc. 127) at p. 12.

**17.** *See Poindexter v. Atchison, Topeka & Santa Fe Railway Co.,* 168 F.3d 1228, 1230 (10th Cir.1999) (citing *Bragdon v. Abbott,* 524 U.S.

must determine if the plaintiff suffers from a physical or mental impairment.[18] If so, the court next identifies the life activities affected by the impairment and determines whether they are major life activities under the ADA.[19] Finally, the court determines whether the impairment "substantially limits" the major life activities identified in the previous step.[20]

■ Plaintiff asserts that he suffers from stress or depression; but, the mere fact that Plaintiff was diagnosed with "depression" commands no "per se conclusion" that he is "disabled within the meaning of the ADA."[21] Nevertheless, because stress or depression may qualify as mental impairment for purposes of the ADA, for the sake of this analysis, the Court will assume that Plaintiff has an impairment. But, "[m]erely having an impairment does not make one disabled for purposes of the ADA." Plaintiff must show that he is substantially limited in a major life activity.[22] The ADA demands that the court examine exactly how a plaintiff's major life activities are limited by the impairment.[23]

■ The court must identify those life activities affected by the impairment and determine whether they are major life activities under the ADA.[24] Although the ADA does not define the term "major life activities," regulations promulgated by the Equal Employment Opportunity Commission provide some guidance. These regulations adopt the definition of "major life activities" found in the Rehabilitation Act regulations. Major life activities "means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."[25] Subsequent interpretation has expanded "major life activities" to include "sitting, standing, lifting, and reaching."[26] In determining whether a particular activity constitutes a "major life activity," the court must ask "whether that activity *is significant within the meaning of the ADA,* rather than whether that activity is important to that particular individual."[27]

■ To state a claim under the ADA, "a plaintiff must articulate with precision the impairment alleged and the major life activity affected by that impairment."[28]

---

624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).

**18.** *Id.*

**19.** *Id.*

**20.** *Id.*

**21.** *Spades v. City of Walnut Ridge,* 186 F.3d 897, 899–900 (8th Cir.1999) (affirming entry of summary judgment because plaintiff's depression was corrected by medication and counseling); *Doyal v. Oklahoma Heart Inc.,* 213 F.3d 492 (10th Cir.2000) (affirming summary judgment where Plaintiff could not demonstrate that her depression substantially limited any major life activities); *See also Den Hartog v. Wasatch Academy,* 129 F.3d 1076, 1081 (10th Cir.1997) (finding that bipolar disorder is a mental disability covered under the ADA if it is sufficiently severe).

**22.** *Toyota Motor Mfg., Kentucky, Inc., v. Williams,* 534 U.S. 184, 193, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

**23.** *See Steele v. Thiokol Corp.,* 241 F.3d 1248, 1253 (10th Cir.2001) (citation omitted).

**24.** *Poindexter,* 168 F.3d at 1230.

**25.** 29 C.F.R. § 1630.2(i).

**26.** 29 C.F.R. Pt. 1630, Appendix to Part 1630–Interpretive Guidance to Title I of the ADA, § 1630.2(i); *See also, Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170 (10th Cir.1996) (lifting is a major life activity.)

**27.** *Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.1999), *cert. denied* 528 U.S. 811, 120 S.Ct. 45, 145 L.Ed.2d 40 (1999) (emphasis added).

**28.** *Poindexter,* 168 F.3d at 1232.

The court "is to analyze only the major life activity asserted by the plaintiff."[29]

 Although Plaintiff does not specifically identify the major life activity he claims has been limited by his impairment, based on Plaintiff's statements and testimony, the Court will presume that his affected major life activities are working and maintaining family relationships. The Tenth Circuit has held that working is a major life activity under the ADA.[30] But, there is no authority that treats "maintaining a family relationship" as a qualifying major life activity.[31] To do so would be problematic, as it would be difficult to impose legally enforceable duties on an employer based on such an amorphous concept.[32]

Once Plaintiff identifies his major life activities, he must show that his impairment "substantially limits" these activities.[33] An impairment "substantially limits" if Plaintiff is "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity."[34]

The Supreme Court has defined "substantially limits" as "considerably" or "to a large degree."[35] In making the determination, the following factors should be considered: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.[36]

 Determining whether an impairment substantially limits a major life activity must also include consideration of the effects of any corrective measures.[37] "[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures-both positive and negative-must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the [ADA]."[38]

 Plaintiff does not show that his impairment affects, much less "substantially limits" his ability to work. "To demonstrate that an impairment 'substantially limits' the major life activity of working, an individual must show 'significant[ ] restrict[ion] in the ability to perform either a *class of jobs* or a *broad range of jobs in various classes* as compared to the average person having comparable training, skills and abilities.'"[39] "[T]he inability to

29. *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 496 (10th Cir.2000) (quoting *Poindexter*, 168 F.3d at 1231).

30. *Doyal*, 213 F.3d at 495–96.

31. The Tenth Circuit has not decided whether "interacting with others" is a major life activity, but stated that it would require more than mere trouble getting along with others. *Steele v. Thiokol Corp.*, 241 F.3d at 1253 (noting split).

32. *See Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir.1997).

33. *Poindexter*, 168 F.3d at 1230.

34. 29 C.F.R. § 1630.2(j)(1).

35. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 196, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

36. *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240 (10th Cir.2001) (citing 29 C.F.R. § 1630.2(j)(2)).

37. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

38. *See id.* at 482, 119 S.Ct. 2139.

39. *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir.1994), *cert. denied* 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995) (quoting 29 C.F.R. § 1630.2(j)(3)(i) (emphasis added)).

perform a single, particular job does not constitute a substantial limitation in the major life activity of working."[40] Plaintiff did not present any evidence that he was limited in his ability to perform either a class of jobs or a broad range of jobs in various classes. And, Plaintiff's own physician certified that he was capable of working without restrictions in January 1999. Although Plaintiff asserts that stress and depression affect his memory, he concedes that his memory is only slightly affected, which he characterizes as an inconvenience, not a substantial limitation.

■ Even if "maintaining family relationships" qualified as a major life activity, Plaintiff fails to show that his stress or depression substantially limited that activity. Plaintiff specifically alleges that he does not socialize with friends as frequently, play golf as frequently or have sexual relations with his wife as frequently; and that he is irritable and argues more with his family when stressed. But, Plaintiff concedes that taking prescribed medication helps. Moreover, there is no evidence that any of Plaintiff's alleged limitations are more severe than the general public's.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that he has failed to establish a genuine issue of material fact as to whether he was "disabled" within the meaning of the ADA. Summary judgment is granted with respect to Plaintiff's ADA claim.

## HOSTILE WORK ENVIRONMENT

Plaintiff claims that during his employment and continuing to the time of his termination, he was subjected to a sexually hostile work environment. This claim too, can be considered abandoned, because Plaintiff has not responded to Defendant's motion for summary judgment on this claim.[41] Even if not abandoned, the hostile work environment claim fails for several reasons.

■ First, the hostile work environment claim is procedurally barred. Plaintiff admittedly did not include a claim for hostile work environment in his EEOC charge. Pro se plaintiffs must strictly comply with all statutorily prescribed requirements for filing suit.[42] Generally, a plaintiff may not bring a claim unless it was part of the timely-filed administrative charge.[43] Furthermore, "because failure to exhaust administrative remedies is a bar to subject matter jurisdiction, the burden is on the plaintiff as the party seeking federal jurisdiction to show, by competent evidence, that [he or] she did exhaust."[44] Plaintiff has made no such showing. Nor has Plaintiff shown that the Tenth Circuit's limited exception to the exhaustion rule applies to this case.[45]

**40.** *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 904 (10th Cir.1997), *aff'd* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

**41.** *See Eckholt v. American Business Information, Inc.,* 873 F.Supp. 526, 534 (D.Kan.1994) (holding that where parties did not respond to an issue in summary judgment motion, parties relinquished any claim on the issue and conceded that summary judgment should be entered against them).

**42.** *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984). The Court also notes that Plaintiff's

prior counsel drafted his charge of discrimination and his Complaint.

**43.** *Wallace v. Beech Aircraft Corp.,* 87 F.Supp.2d 1138, 1146 (D.Kan.2000) (*citing Simms v. Oklahoma ex rel. Dept. of Mental Health,* 165 F.3d 1321, 1326 (10th Cir.1999), *cert. denied* 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999)).

**44.** *McBride v. Citgo Petroleum Corp.,* 281 F.3d 1099, 1106 (10th Cir.2002).

**45.** *Wallace v. Beech Aircraft Corp.,* 87 F.Supp.2d 1138, 1146 (D.Kan.2000) (*citing Simms v. Oklahoma ex rel. Dept. of Mental Health,* 165 F.3d 1321, 1326 (10th Cir.1999),

■ Even if not procedurally barred, Plaintiff's hostile work environment claim fails as a matter of law. To survive a summary judgment motion on a hostile work environment claim under Title VII, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[46]

■ In requiring a showing of a workplace permeated by severe or pervasive discriminatory conduct, the Supreme Court struck a balance between two extremes, creating "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."[47] In so doing, the Supreme Court excluded from actionable conduct that which is "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," because Title VII was not meant to be a "general civility code."[48] " '[S]imple teasing,' . . . offhand comments, and isolated incidents (*unless extremely serious* ) will not amount to discriminatory changes in the 'terms and conditions of employment.' "[49] On the other hand, conduct need not be so severe or pervasive that it seriously affects a plaintiff's psychological well-being.[50]

■ The determination of whether a hostile environment existed "is not, and by its nature cannot be, a mathematically precise test."[51] The court should consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[52] This consideration of the totality of the circumstances is warranted, "because the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation," but should be examined in the context in which they occurred.[53]

cert. denied 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999)); *Jones v. Denver Post Corp.*, 203 F.3d at 755 (*citing Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir. 1997)) (stating that "[t]he suit may include allegations of discrimination reasonably related to the allegations listed in the administrative charge, including new acts occurring during the pendency of the administrative charge"); *Smith v. Board of Public Utils.*, 38 F.Supp.2d 1272, 1284 (D.Kan.1999) (*citing Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1416 n. 7 (10th Cir.1993)) (finding that where the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made, consideration of complaints not expressly included in the EEOC charge would be appropriate.)

**46.** *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998), cert. denied 526 U.S. 1039, 119 S.Ct. 1334, 143 L.Ed.2d 498 (1999) (quoting *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998)).

**47.** *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

**48.** *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citations omitted).

**49.** *Id.* (citation omitted and emphasis added).

**50.** *Nieto v. Kapoor*, 268 F.3d 1208, 1219 (10th Cir.2001) (citation omitted).

**51.** *Id.* at 1220 (citation omitted).

**52.** *Faragher*, 524 U.S. at 787–88, 118 S.Ct. 2275 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

**53.** *McCowan v. All Star Maintenance, Inc.* 273 F.3d 917, 925 (10th Cir.2001) (citations omitted).

Plaintiff contends that he was subjected to a hostile work environment in which employees posted news clippings and photos containing hand-written captions that Plaintiff found offensive. Yet, Plaintiff acknowledges that these postings were equally, if not more, offensive to females. But, as the Supreme Court stated in *Oncale*,[54] Title VII prohibits "discrimina[tion] ... because of ... sex" in the "terms" or "conditions" of employment.[55] Plaintiff must show that the harassment constituted discrimination "because of sex." And, harassment is not necessarily discrimination "because of sex," merely because the words used have sexual content or connotations.[56] The conduct must actually constitute discrimination because of sex, and not be merely tinged with offensive sexual connotation.[57] Instead, the critical issue for a Title VII claim "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."[58] The graffiti does not appear to be gender-based. Plaintiff concedes that the graffiti was offensive to him, but also offensive, and perhaps more offensive, to women.

Nevertheless, in considering the totality of circumstances, even non gender-based conduct may be relevant in evaluating a hostile work environment claim, because it may form a part of the context or environment in which the discriminatory conduct is alleged to have occurred.[59] As the Supreme Court noted in *Oncale* [60]:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.[61]

This "constellation" of circumstances must be evaluated both subjectively and objectively.[62] Actionable conduct is that which a reasonable person in the victim's position would find hostile or abusive, and that which the victim subjectively perceives as hostile or abusive.[63]

While Plaintiff must produce evidence that he was the object of harassment,[64] evidence of a general work atmo-

---

**54.** *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79–80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

**55.** *See also Burlington Indus. v. Ellerth,* 524 U.S. 742, 753–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (noting the difference between hostile work environment and *quid pro quo* claims and stating that when a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII, and for sexual harassment preceding the employment decision the conduct must be severe or pervasive).

**56.** *Oncale,* 523 U.S. at 80, 118 S.Ct. 998; *see also Bibby v. The Philadelphia Coca Cola Bottling Co.,* 85 F.Supp.2d 509, 516 (E.D.Pa. 2000), *aff'd* 260 F.3d 257(3rd Cir.2001) (noting that Congress intended the word "sex" in Title VII to refer to membership in a class delineated by gender, rather than sexual activity).

**57.** *Id.* at 81, 118 S.Ct. 998.

**58.** *Id.* at 80, 118 S.Ct. 998 (citation omitted).

**59.** *McCowan,* 273 F.3d at 925.

**60.** 523 U.S. at 81–82, 118 S.Ct. 998.

**61.** *Id.*

**62.** *Nieto,* 268 F.3d at 1220 (citations omitted).

**63.** *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Turnbull v. Topeka State Hosp.,* 255 F.3d 1238, 1243 (10th Cir.2001), *cert. denied,* 535 U.S. 970, 122 S.Ct. 1435, 152 L.Ed.2d 380 (2002).

**64.** *Penry,* 155 F.3d at 1261.

sphere, as well as evidence of a specific hostility directed toward him, is an important factor in evaluating the claim.[65] The Tenth Circuit has recognized that "[a] finding of pervasiveness or severity need not rest solely on actions aimed directly at a plaintiff, however, but may also consider harassment of others in the workplace." [66]

In considering the totality of the circumstances, the Court concludes that no rational jury could find that Plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. When viewed in the context in which it occurred, the graffiti constituted simple teasing or gender-related jokes, was not physically threatening, and was not directed at Plaintiff. And, Plaintiff relies solely on the presence of the graffiti, presenting no other evidence of sexual harassment in the workplace. Summary judgment must be granted for Defendant on Plaintiff's hostile work environment claim.

**ADEA**

Plaintiff claims that he was terminated in violation of the Age Discrimination in Employment Act ("ADEA"). The ADEA provides that it is "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." [67] Liability attaches only if Plaintiff's age "actually played a role in [the employer's decisionmaking] process and had a deter-

minative influence on the outcome." [68] Thus, Plaintiff must "establish that age was a determining factor in the employer's challenged decision." [69]

■ A plaintiff may attempt to meet this burden directly, by presenting direct or circumstantial evidence that age was a determining factor in the challenged decision, or a plaintiff may meet his burden indirectly by relying on the familiar burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green.*[70] "Proof by direct evidence requires evidence that the actual motive behind the [challenged employment action] was discriminatory animus. Evidence demonstrating discriminatory animus in the decisional process needs to be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." [71] Plaintiff has presented no direct evidence that the actual motive behind his termination was age discrimination. He has not suggested that age-related remarks were made in relation to the decisional process involved in his termination.

■ To establish his claim of age discrimination by the indirect method under *McDonnell Douglas,* Plaintiff bears "the initial burden of setting forth a prima facie case of discrimination." [72] The Court finds that Plaintiff has established the first three elements of his prima facie case. Plaintiff has shown: 1) that he was within the protected age group; 2) that he was

---

**65.** *Id.* at 1262 (citation omitted).

**66.** *Nieto,* 268 F.3d at 1219 n. 7 (citations omitted).

**67.** 29 U.S.C. § 623(a)(1).

**68.** *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quotation omitted).

**69.** *Lucas v. Dover Corp.,* 857 F.2d 1397, 1400 (10th Cir.1988) (quotation omitted).

**70.** *Id.* (citing *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

**71.** *McCrary v. Aurora Public Schools,* 57 Fed. Appx. 362, 367 (10th Cir.2003) (citing *Clearwater v. Indep. Sch. Dist. No. 166,* 231 F.3d 1122, 1126 (8th Cir.2000) (quotation and citation omitted)).

**72.** *Sanchez v. Denver Pub. Schools,* 164 F.3d 527, 531 (10th Cir.1998).

doing satisfactory work;[73] and 3) that he was discharged or received adverse employment action.[74]

■ Defendant argues that because Plaintiff's position was not filled, he cannot meet the fourth element of his prima facie case which requires him to show that a younger person received his position. As a result of the Supreme Court's decision in *O'Connor v. Consolidated Coin Caterers Corp.*,[75] the fourth element no longer requires a plaintiff to show that he or she was replaced by someone outside the protected class to state a prima facie case. In *Greene v. Safeway Stores, Inc.*, the Tenth Circuit noted that "ordinarily" the plaintiff must show that he or she was replaced by a younger person; but not necessarily, because the flexible *McDonnell Douglas* approach is meant to be adapted to the particular type of adverse employment decision in question.[76] The court then noted that in "reduction in force" cases the test is modified to allow a plaintiff to show that older employees were fired while younger ones in similar positions were retained.[77] Although Plaintiff was not discharged for economic reasons and this is not a typical "reduction in force" case, Defendant did not hire anyone to replace Plaintiff. Although the fourth element of a prima facie case has not been stated clearly for this type of situation,[78] the Court will assume that Plaintiff has met this element as well.

■ Even assuming a prima facie case is established, Defendant has met its burden of coming forward with a legitimate, nondiscriminatory reason for its actions. Plaintiff concedes that his discharge stemmed from: (1) a coworker's report to management that Plaintiff made inappropriate comments, which the employee found threatening; and (2) his disobeying management directives about discussing the incidents with other employees.

Because Defendant has proffered a non-discriminatory reason for its actions, the burden shifts back to Plaintiff to demonstrate that the reasons given by the Defendant are pretextual. Plaintiff can meet his burden by showing "that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief."[79] To show pretext, Plaintiff

---

73. A defendant's evidence regarding the reasons for a plaintiff's termination should not be considered when determining whether the plaintiff has shown satisfactory work for purposes of his prima facie case. *See MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1119–20 (10th Cir.1991). Rather, a plaintiff may establish his prima facie case by presenting "credible evidence that [he] continued to possess the objective qualifications [he] held when [he] was hired, ... or by [his] own testimony that [his] work was satisfactory, even when disputed by [his] employer, ... or by evidence that [he] had held [his] position for a significant period of time." *Id.* at 1121 (citations omitted).

74. *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 558 (10th Cir.1996) (citing *Lucas*, 857 F.2d at 1400).

75. 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

76. *Greene*, 98 F.3d at 559–60.

77. *Id.; see also Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 91 (2nd Cir. 2001), *cert. denied* 534 U.S. 951, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001) (stating the fourth element as showing that such discharge occurred under circumstances giving rise to an inference of discrimination).

78. *See Munoz v. St. Mary–Corwin Hospital*, 221 F.3d 1160, 1166 n. 3 (10th Cir.2000) (noting that the court has not addressed whether the modification to the fourth element set out in *Perry v. Woodward*, 199 F.3d 1126 (10th Cir.1999), applies to ADEA claims).

79. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995).

may rely on the same facts he relied on to establish his prima facie case; and the Court may consider this same evidence and inferences drawn from such.[80]

"Mere conjecture that the employer's explanation is pretext for intentional discrimination is an insufficient basis for denial of summary judgment."[81] There are three ways to establish pretext: 1) presenting evidence that defendant's stated reason for the adverse action was false; 2) presenting evidence that defendant acted contrary to written company policy; or 3) presenting evidence that defendant acted contrary to an unwritten policy or practice.[82] Plaintiff claims Defendant acted contrary to its unwritten policy. To show that a defendant acted contrary to unwritten policy or to company practice, a plaintiff often provides evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.[83]

Plaintiff compares his conduct with the conduct of other employees who were not terminated. For example, Ms. Naranjo had used the "F" word, while "joking around." Plaintiff claims that his comments to Ms. Naranjo were also intended to be a joke. But, Defendant accepted Ms. Naranjo's characterization of Plaintiff's conduct as threatening or intimidating.

Plaintiff has not shown that other employees accused of such conduct were not terminated. Instead, Plaintiff argues that Defendant is not credible in asserting that it believed Ms. Naranjo's characterization of the incident. Plaintiff notes that Defen-dant was aware of animosity between he and Naranjo. Plaintiff had previously told Defendant that Ms. Naranjo had "a particular dislike for" him and had falsely accused Plaintiff of swearing at her.

When reviewing a plaintiff's evidence of pretext, the court examines facts "as they appear to the person making the decision" that adversely affected plaintiff.[84] Defendant obviously believed Ms. Naranjo's version of the incident, and not Plaintiff's version. An eyewitness to the incident agreed with Ms. Naranjo's version. The Court may not second guess the business judgment of the employer.[85] Defendant believed Ms. Naranjo and the other witness to the incident and utilized its business judgment to terminate Plaintiff. Plaintiff's disagreement with that determination is insufficient to justify finding that Defendant's legitimate, nondiscriminatory reasons for its actions were a pretext for age discrimination.

Moreover, Defendant did not terminate Plaintiff only because of the incident with Ms. Naranjo. Plaintiff also defied management directives to not talk to other employees and subvert Defendant's investigation of the incident. Plaintiff has not shown that any other employees, who had previously been warned about their threatening behavior, used the "F" word towards a coworker in a threatening manner, then denied making the statement when questioned by management; and then disobeyed management's directive to not talk to coworkers regarding the incident. The in-

---

80. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citation omitted).

81. *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir.1997) (quoting *Branson v. River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988)).

82. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000).

83. *Id.* (citation omitted).

84. *Id.* at 1231.

85. *Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.1999).

cidents cited by Plaintiff are not comparable.

There simply is no evidence that Defendant's decision to discharge Plaintiff was based on anything other than Plaintiff's inappropriate behavior and blatant disregard for management's directive. Viewing Plaintiff's evidence in the light most favorable to him and drawing reasonable inferences therefrom, the Court finds that no reasonable jury could find Defendant's proffered reasons were a pretext for age discrimination. Plaintiff has not shown that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness.[86] Plaintiff's only evidence is his subjective belief that his termination was discriminatory.[87] Plaintiff's feeling that he has been the victim of discrimination fails to demonstrate a genuine issue of fact absent supporting evidence.[88]

## RETALIATION

 Plaintiff claims he was terminated in retaliation for complaining of violations of the ADEA, Title VII and the ADA.[89] Plaintiff need not prevail on the underlying claim of discrimination in order to pursue his retaliation claim.[90] Retaliation claims proceed under the *McDonnell Douglas*[91] burden shifting analysis.[92] Thus, the plaintiff must first present a prima facie case of retaliation.[93] Then, the burden of production shifts to the defendant to produce a legitimate, non-discriminatory justification for taking the action in question.[94] Finally, the burden shifts back to the plaintiff to show the defendant's reason for its action was merely a pretext for discrimination.[95]

 To establish a prima facie case of retaliation, Plaintiff must show: (1) he engaged in protected opposition to discrimination or participated in a proceeding arising out of discrimination; (2) he was subjected to adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.[96] Plaintiff has presented sufficient evidence to make out a prima facie case.

Plaintiff has shown that he engaged in protected activity, that is, he "has opposed

---

86. *Kendrick,* 220 F.3d at 1230.

87. *See id.* at 1231 n. 11 (noting that plaintiff's subjective belief that defendants were conspiring against him was insufficient to create a genuine issue of material fact).

88. *Money v. Great Bend Packing Co.,* 783 F.Supp. 563, 574 (D.Kan.1992); *see also Witt v. Roadway Express,* 164 F.Supp.2d 1232 (D.Kan.2001) (conclusory statements of the nonmovant are not sufficient to survive summary judgment).

89. Plaintiff did not assert a cause of action for retaliation under the Family and Medical Leave Act (FMLA). *See* 29 U.S.C. § 2601 *et seq.*

90. *Ingels v. Thiokol Corp.,* 42 F.3d 616, 625 n. 8 (10th Cir.1994) (citations omitted); *see also Love v. RE/MAX of America, Inc.,* 738 F.2d 383, 385 (10th Cir.1984) (applying this principle in a Title VII anti-retaliation claim).

91. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

92. *See McGarry v. Bd. of County Comm'rs,* 175 F.3d 1193, 1201 (10th Cir.1999); *Lundien v. United Airlines,* 242 F.3d 389, 2000 WL 1786579 (10th Cir.2000).

93. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

94. *Id.*

95. *Id.* at 804, 93 S.Ct. 1817.

96. *Kendrick,* 220 F.3d at 1234; *see also Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1178 (10th Cir.1999) (ADA); *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 533 (10th Cir. 1998) (ADEA).

any practice made an unlawful employment practice by" Title VII.[97] Around January 15, 1999, Plaintiff sent a letter to KCTV management expressing his opposition to alleged discrimination. Plaintiff has also shown that he was terminated, which qualifies as an adverse employment action under Title VII.[98] And, Plaintiff has shown that a causal connection existed between the protected activity, and the adverse employment action. Plaintiff was terminated by KCTV management, which was aware of or should have been aware of his January 1999 letter to management.[99]

■■■■ In addition to showing adverse action by someone who knew of his protected activity, Plaintiff can establish a causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[100] Temporal proximity between the protected activity and the retaliatory conduct may alone establish causation, if the two acts occur very close in time.[101] The Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation,[102] but not where there was a three month lapse between protected activity and adverse action.[103] However, in a very recent decision, *Wells v. Colorado Dept. of Transp.*,[104] the Tenth Circuit held that a five month lapse between protected activity and adverse action was alone sufficient to support an inference of causation, when during most of the five month period, the plaintiff was on medical leave, and the adverse action occurred just seven days after she returned to work. Given that Plaintiff has shown that he was terminated just two months after his letter to management, the Court will assume, for the sake of analysis, that he has, by temporal proximity, shown a causal connection.[105]

■■■■ Once plaintiff establishes a prima facie case, defendant must offer a legitimate nondiscriminatory reason for its action. Defendant has satisfied this burden of production, offering the same reasons it offered with respect to Plaintiff's ADEA claim.

■■■■ While it is true that close proximity between a protected activity and an adverse employment action is a factor in determining whether the defendant's proffered reason is a pretext for retaliation,[106]

---

**97.** 42 U.S.C. § 2000e–3(a); *see also* 42 U.S.C. § 12203(b) (ADA); 29 U.S.C. § 623(d) (ADEA).

**98.** *See Sanchez,* 164 F.3d at 532.

**99.** *See Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1265 (10th Cir.1998) (holding that a retaliatory discharge claim must be predicated on intentional or knowing retaliation).

**100.** *Burrus v. United Tel. Co. of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir.1982), *cert. denied* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). *See also Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999) (assuming, without deciding, that temporal proximity of two months and one week is sufficient to support a prima facie case of retaliation).

**101.** *See O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1253 (10th Cir.2001).

**102.** *Ramirez v. Oklahoma Dept. of Mental Health,* 41 F.3d 584, 596 (10th Cir.1994).

**103.** *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997).

**104.** 325 F.3d 1205, 1216–17 (10th Cir.2003).

**105.** *See Robinson v. Wilson Concrete Co.,* 913 F.Supp. 1476, 1483 (D.Kan.1996) ("A claimant's 'prima facie case is not an onerous burden under the *McDonnell Douglas* burden-shifting scheme.' ")

**106.** *Pastran v. K–Mart Corp.,* 210 F.3d 1201, 1206 (10th Cir.2000) (citing *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 551 (10th Cir. 1999)).

temporal proximity is not, by itself, sufficient to raise an issue of fact.[107] "Timing is particularly insufficient when an employee has engaged in unacceptable behavior in the interim between [his] protected activity and termination."[108] Plaintiff did engage in unacceptable behavior in the interim, and therefore Plaintiff must offer additional evidence of pretext. Plaintiff has failed to do so. Plaintiff has failed to show pretext on his retaliation claim, for the same reasons he failed to show pretext on his ADEA claim. Therefore, summary judgment must be granted for Defendant on Plaintiff's retaliation claim.

## OTHER PENDING MOTIONS

Plaintiff has filed a Motion to Strike Affirmative Defense of Failure to Mitigate Damages. In light of the Court's ruling on Defendant's Motion for Summary Judgment, this motion to strike affirmative defense is moot.

Plaintiff has also filed three motions that are essentially the same as earlier motions that the Court previously denied. For the reasons set forth in this Court's March 10, 2003 Order Granting Leave to Supplement Response and Denying Request for Relief Pursuant to Rule 56(f) (Doc. 141), the Court denies: Plaintiff's Motion to Award Sanctions Pursuant to FRCP 37 Because Defendant Failed to Observe Their Discovery Obligations Pursuant to FRCP 26; Plaintiff's motion for a determination that the Motion to Award Sanctions is uncontested; and Plaintiff's Request for Review of Order Denying Request for Relief Pursuant to Rule 56(f).

Plaintiff has also filed a Motion for Leave to Amend Complaint and a Motion for Leave to File a Supplemental Complaint.[109] Rule 15(a) allows one amendment of the complaint before a responsive pleading is served or within twenty days after service of the complaint. Subsequent amendments are allowed only by leave of court or by written consent of the adverse party. Leave to amend a complaint should be denied when the court finds "undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."[110]

---

**107.** *Id.*

**108.** *Doebele v. Sprint Corp.,* 157 F.Supp.2d 1191, 1221 (D.Kan.2001) (citation omitted).

**109.** Plaintiff brings his motion to supplement under FRCP 15(d), which allows supplemental pleadings setting forth transactions or occurrences or events which have happened since the date of the original pleading. Because Plaintiff is seeking to add an entirely new cause of action based on facts that existed at the time he filed his original complaint, the Court will consider his Rule 15(d) motion as a motion to amend under Rule 15(a). *See Peterson v. Santa Clara Valley Medical Center,* 2000 WL 98262, *1 n. 1 (N.D.Cal.2000) (treating Rule 15(d) motion as a Rule 15(a) motion where plaintiff sought to add claims based upon facts already existing at date of original pleading); *Capitol Indemnity Corp. v. U.S.,* 1996 WL 734668, *2 (S.D.Ill.1996); 6A Fed. Prac. & Proc. Civ.2d § 1504 (stating that Rule 15(d) does not apply to preaction matters of which a party was ignorant at the time he interposed his original pleading); *see also Walker v. United Parcel Service, Inc.,* 240 F.3d 1268, 1278 (10th Cir.2001) (finding that district court did not abuse its discretion in refusing to allow a supplemental claim under FRCP 15(d) where plaintiff sought to add new cause of action, discovery was closed, defendant had moved for summary judgment); *Glatt v. Chicago Park Dist.,* 87 F.3d 190 (7th Cir.1996) (finding no abuse of discretion in refusing to allow a claim to be added 16 months after the original complaint was filed, where claim was based solely on document plaintiff had discovered more than a year earlier).

**110.** *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1365 (10th Cir.1993) (citation omitted).

Plaintiff seeks to amend his complaint to add a cause of action for gender discrimination, on the basis of facts that were contained in depositions taken in February 2002. Deponents testified that women in the KCTV newsroom used profanity in a joking manner and that Defendant's EEO and HR manager was aware of the conduct. Another deponent testified that she had made mistakes without suffering adverse employment action. Plaintiff admits that he has had the transcripts from these depositions since May 2002, and has had the assistance of at least two attorneys since that time, although he claims that he did not learn of evidence of gender discrimination until on or about December 7, 2002.[111] Yet, Plaintiff did not file these motions to amend/supplement until April 4th and 7th, 2003, well after the May 2002 depositions and the Pretrial Order, which was filed October 28, 2002.

Plaintiff's motion is untimely and is another attempt to reopen this case months after discovery is closed, the pretrial order was entered, and dispositive motions were filed. In this Circuit, untimeliness alone is a sufficient reason to deny leave to amend.[112] The Court concludes that Plaintiff's motions are untimely and should be denied.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 128) is GRANTED.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion to Strike Affirmative Defense of Failure to Mitigate Damages (Doc. 110) is MOOT and therefore DENIED.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion to Award Sanctions Pursuant to FRCP 37 Because Defendant Failed to Observe Their Discovery Obligations Pursuant to FRCP 26 (Doc. 140) is DENIED.

**IT IS FURTHER ORDERED THAT** Plaintiff['s] Request[ ] that the Court Rule Plaintiff's Motion to Award Sanctions Pursuant to FRCP 37 Because Defendant Failed to Observe Their Discovery Obligations Pursuant to Rule FRCP 26 as Uncontested Pursuant to Rule 7.4 and Award Sanctions to Plaintiff Without Further Delay (Doc. 143) is DENIED.

**IT IS FURTHER ORDERED THAT** Plaintiff's Request for Review of Order Denying Request for Relief Pursuant to Rule 56(f) (Doc. 142) is DENIED.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion for Leave to Amend Complaint (Doc. 145) is DENIED.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion for Leave to File a Supplemental Complaint (Doc. 144) is DENIED.

IT IS SO ORDERED.

---

**111.** Motion for Leave to Amend Complaint (Doc. 145) at p. 11.

**112.** *Frank,* 3 F.3d at 1365 (citations omitted).